IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | | |
|---|---|---|
| SOLID SYSTEMS CAD SERVICES, | § | |
| | § | |
| Plaintiff, | § | |
| | § | |
| V. | § | CIVIL ACTION NO. H-12-3176 |
| | § | |
| TOTAL RISC TECHNOLOGY, PTY. LTD., | § | |
| TOTAL RISC TECHNOLOGY GLOBAL | § | |
| LIMITED, and DOMENIC ROMANELLI, | § | |
| | § | |
| Defendants. | § | |

**MEMORANDUM AND ORDER**

Pending in this case in which the parties have recently consented to proceed before the undersigned Magistrate Judge is Plaintiff's Motion for Partial Summary Judgment as to Defendant's Counterclaim (Document No. 82). Having considered that motion, the parties' additional briefing and supplemental evidence, and the argument of counsel at a hearing held on February 3, 2015, it is ORDERED, for the reasons set forth below, that Plaintiff's Motion for Partial Summary Judgment is GRANTED in PART and DENIED in PART.[1]

**I.   Background**

Plaintiff Solid Systems CAD Services ("Solid Systems") filed this suit against three Defendants, Total Risc Technology Pty. Ltd. (an Australian corporation), Total Risc Technology Global Ltd. (a Chinese corporation), and Domenic Romanelli, on October 24, 2012.  In its Original Complaint, Solid Systems alleged that Defendants "failed to pay [Solid Systems] for work performed

---

[1] As was discussed at the hearing held on February 3, 2015, Plaintiff's Motion for Leave to File Supplement to Plaintiff's Motion for Partial Summary Judgment (Document Nos. 140 & 141) is GRANTED, and Plaintiff's Motion to Expedite (Document No. 142) is now MOOT.

by [Solid Systems] on behalf of Defendants for the benefit of T-Systems." Complaint (Document No. 1) at 5. The factual basis for the parties' dispute, as set forth in the District Court's Memorandum and Order filed on July 18, 2013, is as follows:

> . . . . In August 2009, Defendant Total Risc Technology Global Ltd. ("Global") entered into a Master Services Agreement with T-Systems Nederland B.V. ("T-Systems") under which Global would perform computer services on behalf of T-Systems. Subsequently, Dominic Romanelli ("Romanelli"), Chief Executive Officer of Global and Defendant Total Risc Technology, Pty. Ltd. ("TRT Pty."), engaged Plaintiff [Solid Systems], a Texas corporation headquartered in Houston, to perform work for T-Systems in Texas and throughout the United States. Plaintiff [Solid Systems] and Global negotiated to attain an agreement, but the drafted written contract ("the Key Agreement") exhibited by Defendants is unsigned by any party.
>
> Plaintiff [Solid Systems] began its work performing computer services for Defendants in late 2009. Defendants made payments to Plaintiff [Solid Systems] until April 2011, when Global's contract with T-Systems expired. At that time, Defendants stopped making payments to Plaintiff [Solid Systems], and Plaintiff [Solid Systems] contends that $1,187,271.26 remains due and unpaid on invoices for work performed by Plaintiff [Solid Systems] before Global's Master Services Agreement with T-Systems expired. Global is separately engaged in a dispute with T-Systems regarding payments due under the Masters Services Agreement, which is being arbitrated in Germany, and Defendants contend that they are not obligated to pay Plaintiff [Solid Systems] until after they receive payment from T-Systems.

Memorandum and Order (Document No. 54) at 1-3 (internal footnotes omitted). Pursuant to that July 18, 2013, Memorandum and Order, Defendants Total Risc Technology Pty. Ltd. and Dominic Romanelli were dismissed for lack of personal jurisdiction. The claims alleged by Solid Systems against Total Risc Technology Global, Ltd. ("TRT Global"), remained. Those claims, set forth in Plaintiffs' Third Amended Complaint (Document No. 59) are for: (1) suit on a sworn account; (2) breach of contract; (3) quantum meruit - unjust enrichment; (4) common law fraud and fraudulent inducement; (5) fraud by nondisclosure; and (6) negligent misrepresentation. TRT Global, in response, has asserted counterclaims against Solid Systems for: (1) tortious interference with existing

2

contract; (2) tortious interference with prospective relations; (3) trade secret misappropriation; (4) conspiracy; and (5) breach of contract.  TRT Global's Answer and Counterclaim (Document No. 60).  It is these five counterclaims that form the basis of Solid Systems' Motion for Partial Summary Judgment.

In that Motion for Partial Summary Judgment, Solid Systems argues that summary judgment is warranted on TRT Global's counterclaims for tortious interference because Solid Systems' conduct was privileged, its actions were legally justified, and there is no evidence that Solid Systems acted intentionally or wrongfully; that summary judgment is warranted on TRT Global's counterclaim for misappropriation of trade secrets because TRT Global's Service Partners list is not, and was not, a trade secret, and that there was no wrongful acquisition or use of TRT Global's Service Partner list by Solid Systems; that summary judgment is warranted on TRT Global's counterclaim for conspiracy because such a claim cannot, as a matter of law, be premised on an agreement between Solid Systems and T-Systems to interfere with a contract to which T-Systems was a party; and that summary judgment is warranted on TRT Global's counterclaim for breach of contract because there was no contract between Solid Systems and TRT Global.

## II.    Summary Judgment Standard

Rule 56(a) provides that "[t]he court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and that the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(a).  The moving party must initially "demonstrate the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett*, 106 S. Ct. 2548, 2553 (1986). Once the

moving party meets its burden,[2] the burden shifts to the nonmovant, "who must, by submitting or referring to evidence, set out specific facts showing that a genuine issue exists that summary judgment should not be granted." *Norwegian Bulk Transport A/S v. Int'l Marine Terminals P'ship*, 520 F.3d 409, 412 (5th Cir. 2008); *see also Morris v. Covan World Wide Moving, Inc.*, 144 F.3d 377, 380 (5th Cir. 1998). A party opposing a properly supported motion for summary judgment may not rest upon mere allegations or denials in a pleading, and unsubstantiated assertions that a fact issue exists will not suffice. *Celotex*, 106 S. Ct. at 2548. Instead, "the nonmoving party must set forth specific facts showing the existence of a 'genuine' issue concerning every essential component of its case." *Morris*, 144 F.3d at 380.

In considering a motion for summary judgment, all reasonable inferences to be drawn from both the evidence and undisputed facts are be viewed in the light most favorable to the nonmoving party. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 106 S. Ct. 1348, 1356 (1986); *see also Tolan v. Cotton*, 134 S.Ct. 1861, 1868 (2014) ("at the summary judgment stage, reasonable inferences should be drawn in favor of the nonmoving party"). "If the record, viewed in this light, could not lead a rational trier of fact to find" for the nonmovant, then summary judgment is proper. *Kelley v. Price- Macemon, Inc.*, 992 F.2d 1408, 1413 (5th Cir. 1993) (citing *Matsushita*, 106 S. Ct. at 1351). On the other hand, if "the factfinder could reasonably find in [the nonmovant's] favor, then summary judgment is improper." *Id.* Even if the standards of Rule 56 are met, a court has discretion to deny a motion for summary judgment if it believes that "the better course would be to proceed to

---

[2] Where "the dispositive issue is one on which the nonmoving party will bear the burden of proof at trial, the moving party may satisfy its burden by merely pointing out that the evidence in the record contains insufficient proof concerning an essential element of the nonmoving party's claim." *Norwegian Bulk Transport A/S v. Int'l Marine Terminals P'ship*, 520 F.3d 409, 412 (5th Cir. 2008).

a full trial." *Anderson*, 106 S. Ct. at 2513.

As was raised by the parties at oral argument on February 3, 2015, and as is particularly relevant here, only "reasonable" inferences may be drawn from the evidence and undisputed facts in a summary judgment context. That means that any inferences "drawn from the record . . . must be rational, reasonable, not idle, speculative or conjectural." *Richoux v. Armstrong Cork Corp.*, 777 F.2d 296, 297 (5th Cir. 1985). "Unsubstantiated assertions, improbable inferences, and unsupported speculation are not sufficient to defeat a motion for summary judgment." *Crawford v. Bannum Place of Tupelo*, 556 F. App'x 279, 282 (5th Cir. 2014) (quoting *Nuwer v. Mariner Post-Acute Network*, 332 F.3d 310, 314 (5th Cir. 2003).

### III. Discussion

In five counterclaims, TRT Global contends and complains that Solid Systems usurped its business relationship with T-Systems. The background allegations in support of TRT Global counterclaims are as follows:

> 33. Global is in the business of providing IT services, including designing, implementing, managing and maintaining enterprise IT Equipment for IBM, HP, Sun and Other Enterprise class equipment on a worldwide basis. Global has offices in the Netherlands, India, Malaysia, Singapore, the Philippines and Hong Kong.
>
> 24. Global had no presence in the United States and [Solid Systems'] principal place of business was in Houston. When T-Systems awarded a Master Services Agreement ("MSA") to Global for Global to provide services for T-Systems worldwide, T-Systems directed Global to make [Solid Systems] a Key Subcontractor to provide the services T-Systems desired to T-System's customers in North America. This arrangement was also made, in part, to accommodate T-Systems' desire to only have one contracting party as a point of contact for services, invoicing and payment. [Solid Systems] agreed to become a Sub-Contractor of Global.
>
> 35. Global and T-Systems entered into the MSA which specifically recognized

that work performed in North America would be performed exclusively by [Solid Systems]. Schedule 14 of the MSA reads, in part, as follows:

> Based on the volume of equipment and number of locations in North America, and *the strategic position* and technical expertise of [Solid Systems], **TS selects Solid Systems CAD Services Inc. [Solid Systems] as a Key Sub-Contractor.** As a Key Sub-Contractor, [Solid Systems] as an entity will be governed according to Clause 36 of the agreement that covers Key Personnel. ***[Solid Systems] has commercial and operational responsibility for all services conducted in the USA*** and Canada as well as responsibility for any Sub-Contractors that [Solid Systems] engages to work in the USA and Canada. Subcontractors are to be governed in accordance with Clause 42 of this agreement. As a Key Sub-Contractor, [Solid Systems] agrees to make available technical support to Rest-of-World in support of the Contractor and client.

(emphasis added). [ ]

36.     During the summer and through the fall of 2010, Global and [Solid Systems] negotiated a Key Terms for Joint Obligation Agreement Regarding T-Systems Master Services Agreement (the "Key Agreement"). Although the Key Agreement was never executed, it sets forth the part of the agreement between the parties so far as it relates to:

9.1     Section 1.1 of the Key Agreement dealt with [Solid Systems'] appointment as subcontractor to Global and reads, in part, as follows:

> TRT [Global] appoints [Solid Systems] as key contractor pursuant to the MSA with operational responsibility for all services conducted under the MSA in the United States, Canada and Puerto Rico ("North America"), as set out in Schedule 14 to the MSA.

9.2     Section 2.1 of the Key Agreement dealt with the applicability of the MSA to the Key Agreement and reads, in part, as follows:

> To the greatest extent permissible by law, ***[Solid Systems] agrees to be bound by the terms and conditions of the MSA as if it were a party to*** it and, without limiting the generality of the foregoing, agrees to be bound in relation to the manner in which services are to be provided, their timing, the ancillary obligations of the Parties, service levels and service credits, the terms of the MSA, its liabilities and limitations and its applicable law, to the [extent] that TRT [Global],

>> as the party legally bound to TS under the MSA shall be fully capable, through [Solid Systems] of honouring all its obligations under the MSA, particularly in relation to North America.

> 9.3 Section 4 of the Key Agreement dealt with invoicing and provided that all services set out in the MSA would be invoiced by Global to T-Systems. Section 4.3 reads as follows:

>> Unless otherwise agreed or required, [Solid Systems] shall invoice its services directly to TRT [Global]. The due date for payment shall be ten (10) business days after payment has been received by TRT [Global] from TS for the relevant invoice.

> 9.4 Section 6 of the Key Agreement dealt with negotiations with T-Systems. Section 6.1 reads as follows:

>> To the greatest extent possible, [Solid Systems] shall be involved (in person, by telephone or through email) in all negotiations and discussions between TRT [Global] and TS which have any bearing on the North American market, including, particularly in relation to scope of services or fee structures.

Although the Key Agreement was not executed, the parties course of performance did not deviate from the obligations set forth in the Key Agreement.

37. The Key Agreement mandated that when performing services for T-Systems, [Solid Systems] would be involved in all negotiations and discussions between Global and T-Systems. The one aspect of the relationship where Global did interface with T-Systems for [Solid Systems] was registration and communication of the service requirement, billing and collection because, as stated, T-Systems wanted to have only one contracting party to deal with in that regard. The actual service in North America was performed by [Solid Systems].

38. [Solid Systems'] claim has arisen because Global and T-Systems are in a dispute concerning the services delivered to T-System's clients in North America by [Solid Systems], among other reasons. This has resulted in T-Systems' failure to pay Global which in turn has resulted in a delay by Global in paying [Solid Systems]. As noted above, Global has no obligation to pay [Solid Systems] until after Global has been paid by T-Systems.

39. During the period of time that Global and T-Systems were operating under the term of the MSA, T-Systems, in breach of its agreement with Global, provided [Solid Systems] with Global's Service Partners list (which is the list of Organisations

which deliver service where Global does not have staff). [Solid Systems] then proceeded to communicate with Global's Service Partners without Global's knowledge. Global was informed by Global's Services Partners that Global's Services Partners were being approached by [Solid Systems] (prior to Global even being given the opportunity to Global's Service Partners). Global's Service Partner network was established over 15 years. Prior to being provided with Global's Service Partner network, [Solid Systems] did not service organisations outside of North America. Upon being provided with Global's proprietary Global Service Partner network information [Solid Systems] instantly obtained access to Global's entire network complete with a list of all the relevant contacts and contracts.

40.  [Solid Systems] engaged in discussions with T-Systems to take over the Global contract as early as July 2010 (via the contract of David Slack and later through direct contact with Timm Werner). In late September 2010 (approximately 28-30th September) [Solid Systems] and T-Systems met in London to discuss [Solid Systems] taking over the service. These discussions involved [Solid Systems] Managing Directors and Executive Team. In addition, there were numerous meetings, discussions and correspondence between [Solid Systems] and T-Systems regarding [Solid Systems] taking over the service the Global was providing to T-Systems. These included:

A.  Meetings between [Solid Systems] and T-Systems (including David Slack and Timm Werner) in both the United States and Europe; and

B.  Email and other correspondence between [Solid Systems] and T-Systems including proposals, transition plans, sparing requirements, service partner listings and associated Master Service Agreements and Scopes of Work; and [t]he MSA T-Systems signed with [Solid Systems] was substantially the same as the MSA that T-Systems and Global had been negotiating.

41.  By the time Global was terminated by T-Systems, [Solid Systems] was already in a position to take over, and did take over, the Global/T-Systems contract. [Solid Systems] took over the Global/T-Systems contract on February 28/March 1, 2011. There was a concern over how Global would react to the termination therefore T-Systems had planned for [Solid Systems] to assume immediate control. T-Systems had purchased spares on behalf of [Solid Systems] (as well as [Solid Systems] purchasing their own spares). T-Systems provided [Solid Systems] with [ ] Global's Service Partner listing (in contravention of the Confidential Information provisions of the MSA). Attached hereto as Exhibit A is correspondence issued by [Solid Systems] to T-Systems on February 28, 2011 – 30 days before the Global/T-Systems contract ended. It shows that [Solid Systems] was very well prepared for the transition and had been working with T-Systems for a significant period in advance of Global being terminated by T-Systems.

TRT Global's Answer and Counterclaim (Document No. 60) at 4-9.  With those background allegations, TRT Global then alleged, in support of its counterclaim for "tortious interference with existing contract" that "Global had a valid contract with T-Systems. [Solid Systems] willfully and intentionally interfered with that contract. [Solid Systems'] interference with Global's contract with T-Systems caused injury to Global." *Id.* at 9.  With respect to its counterclaim for "tortious interference with prospective relations," TRT Global alleged that "[t]here was a reasonable probability that Global would have entered into additional contracts with T-Systems had [Solid Systems] not intentionally interfered with the relationship." *Id.*  As for its counterclaim for trade secret misappropriation, TRT Global alleged that "[t]he identity of Global's service partners is a Global trade secret. [Solid Systems] has used the trade secret in violation of a confidential or contractual relationship with Global." *Id.*  In support of the conspiracy counterclaim, TRT Global alleged that "T-Systems and [Solid Systems] combined to enter into a contract to replace Global months before they had the legal right to do so and by using Global's trade secrets in order to accomplish the purpose." *Id.* at 9-10.  Finally, with respect to its counterclaim for breach of contract, TRT Global alleged that "[Solid Systems'] actions constitute a breach of its contract with Global pursuant to Texas law." *Id.* at 10.

      A.    **Tortious Interference Counterclaims**

A claim for tortious interference with an existing contract requires proof of: "(1) an existing contract subject to interference; (2) a willful and intentional act of interference with the contract; (3) that proximately caused the plaintiff's injury; and (4) caused actual damages or loss." *Prudential Ins. Co. of Am. v. Fin. Review Servs., Inc.,* 29 S.W.3d 74, 77 (Tex. 2000).  A claim for tortious interference with a prospective relationship, in contrast, requires proof that: "(1) there was a

reasonable probability that the plaintiff would have entered into a business relationship with a third party; (2) the defendant either acted with a conscious desire to prevent the relationship from occurring or knew the interference was certain or substantially certain to occur as a result of the conduct; (3) the defendant's conduct was independently tortious or unlawful; (4) the interference proximately caused the plaintiff injury; and (5) the plaintiff suffered actual damage or loss as a result." *Coinmach Corp. v. Aspenwood Apartment Corp.*, 417 S.W.3d 909, 923 (Tex. 2013); *see also Wal–Mart Stores, Inc. v. Sturges,* 52 S.W.3d 711, 713 (Tex. 2001) ("to establish liability for interference with a prospective contractual or business relation the plaintiff must prove that it was harmed by the defendant's conduct that was either independently tortious or unlawful").

Justification is an affirmative defense to claims of tortious interference with contract and claims of tortious interference with prospective business relations. *Prudential Ins. Co. of Am. v. Fin. Review Servs., Inc.,* 29 S.W.3d 74, 80 (Tex.2000) (citing *Calvillo v. Gonzalez,* 922 S.W.2d 928, 929 (Tex.1996)). A justification defense may be based either the exercise of "(1) one's own legal rights or (2) a good-faith claim to a colorable legal right, even though that claim ultimately proves to be mistaken." *Prudential*, 29 S.W.3d at 80; *Beef Cattle Co. v. Green*, 921 S.W.2d 203, 211 (Tex.1996). "[I]f a trial court finds as a matter of law that the defendant had a legal right to interfere with a contract, the defendant has conclusively established the justification defense, and the motive is irrelevant. Alternatively, if the defendant cannot prove justification as a matter of law, it can still establish the defense if the trial court determines that the defendant interfered while exercising a colorable right, and the jury finds that, although mistaken, the defendant exercised that colorable right in good faith." *Prudential*, 29 S.W.3d at 80 (internal citations omitted).

Here, the summary judgment evidence does not support a claim against Solid Systems for

tortious interference with *prospective* relations. The summary judgment evidence in the record makes it clear that the conduct alleged, and complained of, interfered with TRT Global's *existing* contract with T-Systems. As there is no summary judgment evidence that would support a separate claim for tortious interference with a prospective relationship, summary judgment is warranted on TRT Global's counterclaim for tortious interference with prospective relations.[3]

As for TRT Global's counterclaim for tortious interference with an existing contract, the summary judgment evidence *does* raise genuine issues of material fact on that claim, particularly on the willful or intentional interference element, and on Solid Systems' defense of justification. While Solid Systems argues that there is no evidence of any wrongful conduct on its part, and points to evidence of its own that T-Systems terminated its contract with TRT Global for reasons wholly independent of Solid Systems, TRT Global's summary judgment evidence, and the reasonable inferences to be drawn from it, raise fact issues on whether Solid Systems interfered with the contract between TRT Global and T-Systems, whether any interference proximately caused TRT Global's injury, and on whether there was any justification or legal basis for Solid Systems to interfere with the contract  In particular, the summary judgment evidence shows that: (1) Solid Systems met with T-Systems on numerous occasions during the fall of 2010, well before T-Systems terminated its contract with TRT Global; (2) T-Systems advised Solid Systems on February 8, 2011, that it would be replacing TRT Global. This was only four days after T-Systems informed TRT Global of its termination. It also came after Solid Systems had made changes to its accounting

---

[3] It also appears from the parties' submissions and TRT Global's lack of argument and evidence, that TRT Global has abandoned its counterclaim for tortious interference with prospective business relations, and instead is focusing on its claim of tortious interference with an existing contract.

system, which would have allowed it to replace TRT Global as the prime contractor for T-Systems; (3) one of the stated bases for T-Systems' termination of TRT Global was TRT Global's failure to obtain written agreements with its subcontractors, including Solid Systems, a circumstance which TRT Global attributes to Solid Systems and its failure and/or refusal to execute a written agreement; and (4) in late 2010, Solid Systems requested of TRT Global, and TRT Global provided to Solid Systems, a copy of the Master Services Agreement it entered into with T-Systems. The Master Services Agreement subsequently entered into between Solid Systems and T-Systems was nearly identical to that between TRT Global and T-Systems.

There is, admittedly, no direct evidence that Solid Systems, during the fall of 2010, interfered with the contract between TRT Global and T-Systems, suggested to, or encouraged T-Systems to replace TRT Global on the contract, or otherwise "caused" T-Systems to terminate its contract with TRT Global. But, there is circumstantial evidence in the record, and reasonable inferences which could be drawn from that circumstantial evidence, to that effect. TRT Global provided "global" computer services for T-Systems. It is inconceivable that T-Systems would have chosen Solid Systems to replace TRT Global without first ascertaining that Solid Systems had the resources to do so. It is reasonable to infer that such a decision could not have been made without *considerable* input and cooperation from Solid Systems – all of which had to have occurred prior to February 8, 2011, during the time frame that Solid Systems was TRT Global's subcontractor and during the time frame that TRT Global had an existing contract with T-Systems.

Upon this record, with all reasonable inferences being drawn in TRT Global's favor, the undersigned concludes that genuine issues of material fact preclude summary judgment on TRT Global's counterclaim for tortious interference with a contract.

### B. Misappropriation of Trade Secret Counterclaim

A claim for misappropriation of trade secret(s) proof of the following: (1) the existence of a trade secret; (2) the acquisition of the trade secret through the breach of confidential relationship or by other improper means; (3) the use of a trade secret without authorization from the plaintiff; and (4) damages. *Taco Cabana Int'l, Inc. v. Two Pesos, Inc.*, 932 F.2d 1113, 1123 (5th Cir.1991), *aff'd*, 505 U.S. 763 (1992); *H.E. Butt Grocery Co. v. Moody's Quality Meats, Inc.*, 951 S.W.2d 33, 34 (Tex. App. – Corpus Christi 1997, review denied); *Lamont v. Vaquillas Energy Lopeno Ltd, LLP*, 421 S.W.3d 198, 210 (Tex. App–San Antonio 2013). A trade secret is "any formula, pattern, device or compilation of information which is used in one's business and presents an opportunity to obtain an advantage over competitors who do not know or use it." *Computer Assocs. Int'l, Inc. v. Altai, Inc.*, 918 S.W.2d 453, 455 (Tex. 1996). But, for a trade secret to be afforded protection under Texas law it must indeed be "secret," *H.E. Butt Grocery*, 951 S.W.2d at 35, meaning it its "not generally known or readily available," *T-N-T Motorsports, Inc. v. Hennessey Motorsports, Inc.*, 965 S.W.2d 18, 22 (Tex. App.–Houston [1st Dist.] 1998, pet. dism'd), with the owner taking reasonable precautions to protect against its disclosure. *J.C. Kinley Co. v. Haynie Wire Line Service Inc.*, 705 S.W.2d 193, 198 (Tex. App.–Houston 1985, writ ref'd n.r.e.). While trade secret protection is not available for information and material that is "publicly" disclosed, *Gonzales v. Zamora*, 791 S.W.2d 258, 264 (Tex. App.–Corpus Christi 1990, no writ), it does extend to information that is disclosed pursuant to a confidential or contractual relationship. *General Universal Systems, Inc. v. Lee*, 379 F.3d 131, 151 (5th Cir. 2004).

In deciding whether information constitutes a trade secret, courts are to consider the following six factors:

> (1) the extent to which the information is known outside the business of the entity claiming the trade secret, (2) the extent to which it was known by employees and others involved in the business, (3) the extent of the measures taken by the entity to guard the secrecy of the information, (4) the value of the information to the entity and its competitors, (5) the amount of effort or money expended by the entity in developing the information, and (6) the ease or difficulty with which the information could be properly acquired or duplicated by others.

*Heil Trailer International Co. v. Kula*, 542 F. App'x 329, 332 (5th Cir. 2013) (citing *In re Bass*, 113 S.W.3d 735, 739 (Tex. 2003)). "Unless established or disproved as a matter of law, the existence of a trade secret is a question of fact." *Boeing Co. v. Abbott*, 412 S.W.3d 1, 9 (Tex. App.–Austin, 2012, review granted Nov. 21, 2014); *see also Zoecon Indus., a Div. of Zoecon Corp. v. American Stockman Tag Co.*, 713 F2d 1174, 1179 (5th Cir. 1983) (whether "customer information is generally known or readily ascertainable is a question of fact").

Here, there are genuine issues of material fact as to whether TRT Global's Service Provider list is a trade secret. While Solid Systems maintains that it could have discovered all of TRT Global's Service Providers on its own, TRT Global has countered that the development of its Service Provider list was accomplished over a period of fifteen years, during which TRT Global "vetted" and investigated the ability of potential service providers to provide the type and quality of service TRT Global and its clients required. The fact that "knowledge of a product or process may be acquired through inspection, experimentation, and analysis does not preclude protection from those who would secure that knowledge by unfair means." *Sharma v. Vinmar International, Ltd.*, 231 S.W.3d 405, 424 (Tex. App–Houston [14th Dist.] 2007).

Additionally, while there is summary judgment evidence in the record which shows that Solid Systems obtained TRT Global's Service Provider list from both T-Systems and TRT Global pursuant to the "Exit Plan" provisions in the MSA, and that such acquisition and use was wholly proper, it

is TRT Global's position that Solid Systems orchestrated the circumstances whereby the terms of "Exit Plan" provision came into play, requiring the disclosure of the Service Provider list. In essence, TRT Global maintains that the Solid Systems "wrongfully" acquired the Service Provider list by virtue of its interference with the contract between TRT Global and T-Systems, which interference led to the termination of the contract between TRT Global and T-Systems, and which termination required the disclosure of the Service Provider list under the Exit Plan provisions. This is a novel argument and position, and there is no legal precedent in Texas that either allows or disallows the argued for "melding" of a trade secret misappropriation claim with a tortious interference claim. But, because the claims appear to be inextricably intertwined, and because the key inquiry on a misappropriation of trade secret claim is, and always has been, whether the trade secret was acquired by "improper means," *Hyde Corp. v. Huffines*, 158 Tex. 566, 314 S.W.2d 763, 769 (1969), TRT Global's counterclaim for misappropriation of trade secret will also be retained trial.

        **D.**      **Conspiracy Claim**

The elements of civil conspiracy are "(1) two or more persons, (2) an object to be accomplished, (3) a meeting of the minds on the object or course of action, (4) one or more unlawful, overt acts, and (5) damages as a proximate result." *Tri v. J.T.T.,* 162 S.W.3d 552, 556 (Tex. 2005). The object to be accomplished must either have an unlawful purpose or a lawful purpose which is to be gained through unlawful means. *Ins. Co. of N. Am. v. Morris,* 981 S.W.2d 667, 675 (Tex 1998); *Massey v. Armco Steel Co.*, 652 S.W.2d 932, 934 (Tex. 1983). Moreover, the parties "must be aware of the harm or wrongful conduct at the inception of the combination or agreement." *Triplex Commc'ns, Inc. v. Riley,* 900 S.W.2d 716, 719 (Tex. 1995). As explained by the Texas Supreme

Court in *Schlumberger Well Surveying Corp. v. Nortex Oil & Gas Corp.,* 435 S.W.2d 854, 857 (Tex. 1969):

> There must be an agreement or understanding between the conspirators to inflict a wrong against, or injury on, another, a meeting of minds on the object or course of action, and some mutual mental action coupled with an intent to commit the act which results in injury; in short, there must be a preconceived plan and unity of design and purpose, for the common design is of the essence of the conspiracy.

Solid Systems argues, and TRT Global has not disputed, that TRT Global's conspiracy claim fails because T-Systems, Solid Systems' alleged co-conspirator, could not, as a matter of law, have been involved in a conspiracy to interfere with a contract to which it was a party. Because, as Solid Systems argues, T-Systems could not have interfered with a contract to which it was a party, *Stroud Production, L.L.C. v. Hosford*, 405 S.W.3d 794, 812-13 (Tex. App.–Houston [1st Dist.] 2013, review denied); *Four Brothers Boat Works, Inc. v. Tesoro Petroleum Companies, Inc.*, 217 S.W.3d 653, 668 (Tex. App.–Houston [14th Dist.] 2007, review denied), there is no underlying tort involving "two or more persons" that could support TRT Global's counterclaim for conspiracy. Summary judgment is therefore warranted on TRT Global's conspiracy counterclaim.

### E. Breach of Contract Claim

A breach of contract claim requires proof of: (1) the existence of a valid contract; (2) performance or tendered performance of the contract by the plaintiff; (3) breach of the contract by the defendant; and (4) damages to the plaintiff as a result of the defendant's breach. *Frost Nat'l Bank v. Burge*, 29 S.W.3d 580, 593 (Tex. App.–Houston [14th Dist.] 2000, no writ); *Wright v. Christian & Smith*, 950 S.W.2d 411, 412 (Tex. App.–Houston [1st Dist.] 1997, no writ). Whether a valid contract exists and whether a party's admitted conduct constitutes a breach are generally both questions of law. *E.P. Towne Center Partners, L.P. v. Chopsticks, Inc.*, 242 S.W.3d 117, 123 (Tex.

App.-El Paso 2007, no pet.); *Effel v. McGarry*, 339 S.W.3d 789, 792 (Tex. App.–Dallas 2011, review denied).

Here, there is no dispute that the parties did not have a written contract. Solid Systems maintains that any contractual arrangement between it and TRT Global was on a project-by-project, or work-order by work-order, basis. TRT Global, in contrast, maintains that the parties course of conduct was essentially the same as, and in accord with, the terms of a "Key Agreement" that was never executed. Regardless of the parameters of the parties' agreement or contract, TRT Global has not articulated, and has not come forth with any summary judgment evidence, of any specific breach by Solid Systems. All TRT Global alleges is that Solid Systems is in "breach." That allegation, coupled with the absence of any summary judgment evidence that would support the existence of a breach by Solid Systems, defeats TRT Global's counterclaim for breach of contract. Summary Judgment is therefore also warranted on TRT Global's counterclaim for breach of contract.

## IV. Conclusion and Order

Based on the foregoing and the determination that genuine issues of material face preclude summary judgment on TRT Global's counterclaims for tortious interference with a contract and the intertwined claim for misappropriation of trade secret, but that there is no genuine issue of material fact requiring a jury trial on TRT Global's counterclaims for tortious interference with prospective relations, conspiracy and breach of contract, it is

ORDERED that Plaintiff's Motion for Partial Summary Judgment as to Defendant's Counterclaim (Document No. 82) is GRANTED in PART and DENIED in PART, with summary judgment being GRANTED in Plaintiff Solid Systems' favor on Defendant TRT Global's

counterclaims for tortious interference with prospective relations, conspiracy and breach of contract, and DENIED on TRT Global's counterclaims for tortious interference with a contract and misappropriation of trade secret.

    Signed at Houston, Texas, this 3rd day of March, 2015.

Frances H. Stacy
United States Magistrate Judge